$3.889. So the next case to be argued is Danica Love-Brown as appellant versus Stored Value Cards, Inc. and Central National Bank and Trust Company, and this case is set for 15 minutes per side. So for the appellant, we have Ms. Carla Gilbride. Ms. Gilbride, good morning. If there's a way that they can lower the podium a little, with the magic of technology, that way we can see you. Okay, please proceed. Good morning. May it please the Court, Carla Gilbride on behalf of Danica Brown and the proposed class. I would like to reserve three minutes for rebuttal. When Danica Brown was arrested, she had around $31 in cash with her, and when she was released from custody just a few hours later, that $31 was placed in an account owned and controlled by Defendant Central National Bank. That appropriation of Ms. Brown's money was a per se taking. What Ms. Brown received in place of her money was a NUMMI financial debit card that she did not request, and that had already been validated before it was given to her in violation of the Electronic Fund Transfer Act. That debit card was also programmed to begin taking Ms. Brown's money from the account at Central National Bank and transferring it to NUMMI within five days of activation, unless Ms. Brown took affirmative steps to intervene. That process... It said something like approximately five days or something like that, but go ahead. Well, there were two types of cards that NUMMI Financial had that were eligible to be used by partners, such as the Multnomah County System. There was a three-day card where the charges started after approximately 72 hours. The type that Ms. Brown was given, the C-17 program, the charges started after approximately five days of activation. And again, the activation was not done by Ms. Brown. It was done by an official at the jail before the card was given to her. And that process of having fees deducted from the access device, from the account, within just five days, was a separate violation of EFTA and a separate taking. It's also not the way that money typically behaves. Ms. Brown's cash would not have spontaneously jumped out of her pocket and into the hands of a corporation five days after being arrested. And that is why the district court erred in finding that the card Ms. Brown was given was the functional equivalent of the cash that it replaced. It was also, if the district court had gone on to the second step of the takings clause analysis, as it should have done, the fact that these burdensome and unclear fees were attached to the product should have been a basis for finding that the card was also not just compensation for the cash that was taken from Ms. Brown. But the district court never got to that second just compensation step because it found that the functional equivalence ended the inquiry. That because the card was the functional equivalent of the cash that it replaced, that was all that it needed to decide to end the takings clause inquiry. And there were other mistakes. What the district court seemed most troubled by and what seems the hardest issue is, how is this different from a check? In the district court, you were quite clear that you weren't claiming that a check was a taking. I mean, I guess there are several answers to that. One is that the check doesn't move money around to somebody else's account. Another one is that it doesn't start deteriorating in amount after a while. But for the first five days, in terms of the problem is that there was a lot of emphasis in the district court and to some degree in the briefs on the difficulty of retrieving the money within the first five days. And insofar as that's the emphasis, it does seem to me the check analysis is a problem or analogy is a problem. A few responses to that, Judge Berzon. For one thing, Ms. Brown would never have been given a check. That doesn't matter. Eighty percent of the people who were released from Multnomah County were not given checks. That's why that matters. I mean, you still have to deal with the hypothetical that she would have been. She could have been. I mean, that's not what they did in this county, but it could have. And there are several ways in which a check is less of a, it certainly doesn't implicate the statutory claims that we raised under the Electronic Funds Transfer Act, where here what was given to her was a preloaded, preactivated debit card that had, not only was it preactivated in violation of 15 U.S.C. Section 1693I, but it also had fees that were impermissible for a general purpose prepaid card under 1693L1, which is a separate provision of EFTA. Those are specific violations that are triggered by the type of financial device that NUMMI and its partners at Multnomah County chose to use here. The other difference between a check and this card. Just for clarification, it would be helpful to me to argue one legal theory at a time. Otherwise, it's very confusing. I thought you were arguing the takings theory. We can stay with the takings theory, Your Honor. And you can switch, but just as to one at a time. Sure. So with respect to, for purposes of the takings clause, why a check, I would say that that comes into play with respect to the second stage of the analysis. So the first question is, is it a per se taking or is it a regulatory taking? There were two different arguments that Ms. Brown made regarding takings. So is it a per se taking? Our position is and has always been that when the money was moved from her custody to the custody of Central National Bank, that was a per se taking. And then there were conditions. That would mean that if there were, if the directions that she was given was, here's your card and you can, and there weren't any fees, and you can go to any bank and get cash for it, that would still be a taking. I mean, they would have moved the money, but there would be no impediment to getting the fee. No more impediment to getting the cash than with a check and no fees. That's correct. And that would be a taking because she would have to take affirmative steps in order to access her money. True of a check. That's true. I think you're undermining your own argument, really. That's true that she would have to take affirmative steps to access a check. And here's where the regulatory taking analysis comes in and perhaps is a better fit when the check hypothetical is brought into the equation. Not conceding the point that the check hypothetical really belongs in the equation because we do believe it's outside of the scope of her experience with what would have happened in the past and what happens in most corrections institutions with small value, small amounts of money like hers, her $30. It's a rule for people who had more than $100 or less than $100. I don't think that's a useful rule. It doesn't make any sense. So we need to keep the eye on how these pieces fit together. Sure. So I have two responses. One is with respect to the regulatory takings analysis, which looks at the restrictions that are placed on the use of the property. So in this case, bringing the check back in, if we're comparing a check that you would have to take some affirmative steps in order to access the money on that check, the fees would not start to accumulate after just five days as they do here. If the check is ultimately uncashed after a period of 90 days, the value on that check would sheet back to the state, as opposed to the entire value of the check going to these private parties, which is what happens under the card arrangement. And there are additional burdens on using the card with respect to having an amount that could be greater if you use this card, for example, at a gas station or at a hotel to cover certain expenses. Go back to the per se taking. Isn't the — it seems to me that you're making life more difficult for yourself than you have to by saying that it was just moving the money to their account. That's the per se taking. It seems to me that the per se taking is they moved it to their account and they gave her something that does not have the attributes of cash or a check because it starts losing value in five days. And to focus just on the first five days doesn't tell you that the value of the card is the same as cash because many people don't want to do things in five days. I mean, doesn't that make it at least arguably — the taking is that you're giving something of different value than you took. You are giving something that is of different value and is a fundamentally different type than what you took. If you look at it through the property as a bundle of sticks analogy that Horn v. Department of Agriculture and several other Supreme Court cases have used, one of the bundle of sticks in your property right is the ability to have sole possession of the property and to exclude others from its use. And that would be true, you know, certainly of the cash that Ms. Brown had. But what she was given instead, this card, automatically had the defendant's hands on it and they had the right to take from it. She did not have the right to exclude them. In order to exclude them, in order to get the money back into her sole and exclusive possession again, she had to take affirmative steps and she had to do it with a clock ticking against her within five days at a time when she, like many people released from incarceration, was dealing with trauma, was dealing with the need to deal with her criminal situation, many other things going on in her life that made — Counsel, I don't recall for certain how much time you said you wanted to save for rebuttal, but you're down to about four minutes now. And what I would like to say is, although Judge Prezant's question should be answered fully, I had one question for you. My question is, assuming that the initial tender of the debit card is not a violation of 1693I, does it become a violation of 1693I upon the first charge of the $6? Your Honor, it becomes a violation of 1693L1 upon the charge of the maintenance fee because under 1693L1, a general-purpose prepaid card like this would only be able to charge a fee after one year of inactivity. Here, there were only five days and there actually had been activity on the card, and so this was an impermissible fee under that provision of EFTA. The 1693I violation, in our view, happened immediately when the card was activated without Ms. Brown's consent because these devices, by definition, are not something that the arrestees have any choice. It's the only method in which they could obtain their money, and they do not have the ability to get a check or cash if that would be more convenient. It is the card or nothing at all, and I'll reserve the balance of my time. Okay, thank you. May it please the Court. My name is Eric Nystrom, and I represent the appellees in this case, stored value cards and Central National Bank. The first issue that I would like to address is the takings issue. Can I ask some factual questions? As far as I can tell, and you can tell me if I'm wrong, she got the card. Because you rely in the takings and what Laura is referring to, a voluntary notion of the fact that she knew and could have gone and gotten the cash. Was she ever told, she's given this two-page, to my mind, illegible thing, that aside from the two-page illegible thing, and I haven't really been able to read it because it's illegible, I guess I've read some of it, but it's not easy. And then she was given the card, which on the back of it does say something about a fee after five days. And then she was given a separate card, which you represent as having told her that she could go to a bank and get cash, but I don't see that it does that. Was she told, other than maybe on this two-page illegible piece of paper, that she, how she could go and get cash? Yes. Where? In the terms and conditions that would have been provided along with it. On the two-page, what I'm calling the two-page illegible thing. Other than that. There were two, there were wallet cards, and that's what you're referring to as the illegible piece. She also received a terms and conditions card, which explained exactly how she could go to a bank. The one that's called debit release card information, new me financial, that one? I believe that's the one you're referring to. All right, it doesn't say that. The one that I see, and I've looked all the way through the record, it says surcharge-free ATM locations, and it has a list, except it's not true because it's also in the record that Multnomah County did not arrange for that, and they were not, she couldn't have gotten the cash that way. And then it says, other major nearby banks, cost varies. That's what it says. And then there's another one that maybe says something about, I don't know if she got something else that said something about you can go to a retailer, you can get cash back. But where, I didn't, I actually saw nothing that said that you can go to a multi, a MasterCard-affiliated bank and get cash. We're talking about two different documents, Your Honor. The document that I'm talking about is something called the cardholder terms and conditions that is given along with the wallet cards when she was discharged. And that's where it discloses that the. Yeah, that's what I'm calling the illegible one. The one that goes on for two pages and it's called newbie prestige prepaid MasterCard cardholder agreement important terms and conditions, that one? Yes. And that one goes on, it's a seven-point type thing, and somewhere in there it says that? Yes, it does. And the one that's in the record is actually not representative of the size that was actually given to her at the time that she was released. In addition to that, one of the things that she knew that she could do is go to the newbie website and literally for free transfer the money that was being held in the account at C&B to her own bank account. That requires A, that she had a bank account. I'm sorry? It requires A, that she had a bank account. So that's already different than cash. And it requires B, that she wants to deal with newbie and give us information and so on. That's certainly true. She testified that she was very comfortable with electronic banking transactions, and without any reason she said, well, I shouldn't say without any reason, but she just said she didn't want anything more to do with newbie. But that doesn't change the fact. But your ultimate position is that the notice that she had, that she could go to a bank and get the money was on this two-page many, many paragraph thing. I haven't verified that it's even there. But you gave her various other pieces of paper. There's also this poster that's in the record. But none of them say you can go to a bank and get the money. Nothing that's easily accessible. The terms and conditions do say that. I know, but why would you give her a little card that's supposed to tell her what to do that doesn't say it? If you wanted her to do it, it's because you didn't want her to do it. I disagree. One of the things that she could have also done, and if we're talking about the record in this particular case, is that she could have gone to a retailer, made a purchase, and gotten cash back. If they were willing to do it. Pardon me? If the retailer were willing to do it. That was not a right of any kind, as I understand it. It's up to the retailer. I'm not aware of a retailer that prohibits that, because the card is a payments card. And there are no restrictions on getting that cash back. For example, she could have gone to the Starbucks the day that she was released, bought her $4 and whatever her purchase was there, and received the rest in change in cash. The point is, is that in all of this, when we're looking at a takings claim, the threshold issue in the very first instance, is there something that compels her, in this case, to incur fees? And the answer to that question is no. And once you answer that question no, that there hasn't been a taking, then in terms of analyzing whether the fees are reasonable or not, doesn't really even come into play. Counsel, does the Electronic Funds Transfer Act compel your clients or clients to take some other action before they give her an activated debit card? It does not, because it doesn't apply for two reasons. I want to deal with the portion 1693L1, which governs prepaid cards and restricts fees and expiration dates. That one didn't apply because this card is not something that is marketed to the general public. We fall within that exception. I thought that the Consumer Financial Protection Board, if I've got the name of the agency right, disagrees with you on that. The answer on that question is no, they do not disagree with us on that particular issue. And as the district court found, they do give some examples of when a card is marketed to the general public. Do they believe that if a card is marketed to jail inmates or prison inmates that that qualifies? I don't know what the CFPB has a particular stance on that issue. What I do know is that this card is marketed to correctional institutions and facilities. It is never, ever, ever directed at anybody that would be an inmate. There just isn't. I want to turn to the second part of your question, Your Honor. What is it? The second part of your question on 1693I. First of all, I don't believe that claim was properly before this court because it was never addressed by the district court. That claim was abandoned in the face of a motion to dismiss below. And when we did argue the motion to dismiss on the Electronic Fund Transfer Act claim, that wasn't argued by the plaintiff in either the brief or oral argument. But I thought there was like a motion to amend then to reassert that claim. There was a motion to amend that was made, and Judge Mossman did not grant that motion. But I'll take that even a further step is that the 1693I does not apply because it doesn't involve a consumer's account as defined under the regulations. And in order to have that, the account that we're talking about has to be established for personal family or household purposes. The account that we're dealing with in this particular case was an account that was established by Central National Bank for the benefit of NUMMI to hold these funds. It was a business account in the first instance. The regulations have also been very clear up until April 1 of 2019 that prepaid cards such as this are not encompassed within 1693I within that definition of account. That's been a very consistent position that the Federal Reserve has taken and the CFPB up until April 1 of this year when the regulation was amended. Did it take the opposite position? As I read the regulation previously, it just took no position on this question. The commentary in terms of what was adopted in 2006, the regulation was amended to include prepaid payroll cards. At that time, the Federal Reserve was the body governing this, and they were very explicit that that is the only card that was designed to come within 1693I, and it didn't include anything else. The Fed did a further amendment in 2010, which dealt with the restrictions on fees and expiration dates under 1693L1. But at no time until this year did any regulatory agency take the position that these prepaid cards were subject to 1693I. But since they're taking that position now, it must be within the statute, unless you're arguing that it's not within the statute, that it's an invalid regulation, and if it's within the statute, then the fact that there was no regulation saying it was within the statute doesn't preclude us from saying it was within the statute. It seems logically that it would be in the statute. It is within the definition and the interpretation today, because what the CFPB has done is that they have specifically said that as part of the definition of account, we are now going to include prepaid cards. Oh, I understand that, but they can't say that if it's not in the statute, if it's inconsistent with the statute. Well, I think that the reason that it didn't apply, well, the reason that it didn't apply before was that it dealt with the purpose for which an account was established. And the purpose had to be for family, household, excuse me, personal, family, or household purposes. And unless the account established at the institution was established for that purpose, it didn't come within 1693I. And now it does, just poof? I mean, the statute hasn't changed. If the statute hasn't changed and there was nothing in the regulation before that said this doesn't count, then it's an interpretive question whether it does count. Now we know that the agency's position is it does count, but that doesn't mean that before that it didn't count. The regulatory authorities before the CFPB took over, which was the Federal Reserve, made very clear in its rulemaking in 2006 that it didn't come in there. And that the only inclusion. But not in the regulation. The regulation never said that. The regulation spoke to for the purpose of personal, family, or household. It still says that. And it still does. But the Fed, when it amended the Regulation E in 2006, specifically included the payroll cards. I want to go back to my original question. Okay. I now have read the little minuscule title. And as far as I can tell, the only way you might be able to figure out that you could get this money is there's a list of fees. It says fee schedule. When using the card, you will be charged the fees listed in the fee schedule below. And then it says no fee services. Card to bank funds transfer. Retail purchase. And then there's a little thing saying but not necessarily because they may not give it to you. Cash back at a merchant. I mean, that one they say it may not give it to you. Bank over-the-counter withdrawals. Correct. So that's it. It doesn't say what bank. In fact, it's not any bank. It's only certain banks. Well, they're MasterCard member banks. That's correct. And it doesn't say that. Somewhere there was a declaration that said that she was given a list of nearby banks, but, in fact, she wasn't. The banks that were referred to dealt with, and this is the issue I think you raised earlier, dealt with surcharges with ATMs. Right, and then there was another list of banks, and they said, but these banks might charge you. With respect to ATMs. I mean, in terms of Judge Mosman's assumption that there was some way that an intelligent person would have figured this out, it's really murky. You could have given clear notice. You could have said, you know, the jail could have said there's a bank around the corner where you can cash it, but they certainly didn't do that. The jail didn't do that? No, I mean. Allen Newman didn't do it. Nobody did it. Well, in the wallet card, when you talk about bank over-the-counter withdrawal, that is giving you notice that you can do that. It's up to. The card didn't say anything about bank over-the-counter withdrawal. It was only that these terms and conditions had said it. Well, the wallet card did. Really, Mayor? The wallet card. When you were listing the number of ways that you could cash back. That wasn't the wallet card. That was this two-page very. . . Oh, that was the terms and conditions that you were reading from. The wallet card could have said it, but it said there's an accurate thing. It says surcharge-free ATM locations, but, in fact, they weren't surcharge-free ATM locations. Correct. It wasn't accurate.  I mean, we could decide this case very easily by simply saying, you know, as to what she was actually told, there was no voluntariness about the fact that she didn't get that money. I disagree with that. She admitted that when she sat down and went through the materials, she understood she could do an Internet withdrawal. She also understood that she could go to a bank and get her cash. She understood it. When did she understand it? The record's not clear on that, Your Honor. Okay. My overall point, when it goes to that, is that she did express an understanding of how she could do this without incurring fees and had an opportunity to do so and did not do it. The question is that, really, in the first instance, is she compelled to incur these fees? I don't think on this record that you can say that. In terms of the takings argument, all right, if somebody gives you cares or they give you a check, you don't have to sit around figuring out how to keep your money from deteriorating. I mean, that's really the problem here. You have to actually take affirmative steps or your money starts to go away, and that's different from a check. I disagree with that. It's a matter of timing in both instances. With a check, at some point the check becomes stale and can't be cashed. I don't know what point that time is, but it does become stale and can't be cashed. In this particular case, there is a five-day window that she can go and get her cash back. Usually what you do about that is you go back to the original person and say, give me another check. Give her a check? No. I mean, if the check goes stale, you go back to the issuer and you say, I need another check. I don't know whether the jail would do that, but they should. I don't know what they would do either based on this record. My experience with my daughter who puts her checks in her garage and forgets to cash them. I have one of those, too, although they do get cashed eventually. But, no, I think that Judge Mossman, the Dictator of Courts' analysis on this that is most pertinent here is the one is the check-card comparison. Even Ms. Brown and her counsel recognize that this card offers more liquidity than a check. Once you recognize that the card offers more liquidity than a check, I think that the constitutional analysis is over at that point because we know that providing a check is something that is constitutionally acceptable. Okay, counsel, you're a little over your time. But if Judge Berzon or Judge Benitez have questions. No questions. Unless anybody has any other questions, I will conclude then, and I'd ask the Court to affirm the district court's order in its entirety. Thank you, counsel. Thank you. Ms. Gilbride will get the rebuttal. Argumentant Kelly, could you add? What's the time she has? Two minutes. So add another two minutes. We're giving you two extra minutes. Thank you, Your Honor. I'll try to use them well. I have three points on rebuttal. First, with respect to the 1693I claim, it was not waived. The claim was specifically addressed, or the concept of Regulation E and whether it applies to this type of card was specifically addressed by defendants in their motion to dismiss at Excerpts of Records 718 to 719. They discussed EFTA and Regulation E. What's Regulation E? Regulation E, yes, which is 12 CFR Section 1005. That's where all of the regulations around, you know, these access devices for moving money electronically. And then at 721 to 722, they went on to specifically make the same argument they've just made this morning and in their appellate briefing about why they contend this isn't an account, this isn't covered by the regulation. I thought it was alleged in your first complaint, taken out of the First Amendment complaint. Is that wrong? It's true that the specific subsection, 1693I, was mentioned in the first complaint and not in the First Amendment. The original complaint and not in the First Amendment, that's true. Our point is that they were on notice that Regulation E was at issue because they briefed it in their motion to dismiss, so they were not prejudiced. And then as Judge Gould mentioned. In the end, you tried to amend the complaint and it was refused. Correct. But without any reasoning. I mean, did Judge Busman ever say why he was refusing it? No. There was no hearing on the motion for leave to amend. It was simply a docket entry. There was no written order explaining the judge's reasons. And that. Can I interrupt you for just a second? Sure. So if it was not omitted after the motion on the first complaint, the original complaint, why would there have to be a motion for a third amended complaint, raising the issue again? Well, the proposed third amended complaint included a great deal of additional factual support, such as the extensive compliance program that the defendants had for complying with Regulation E and some dispute between Central National Bank and NUMMI about whether they were currently in compliance and how to come into compliance. That all came out through discovery. Is Regulation E only about, this is why I asked, only about sub I or it's about the entire statute? It's about the entire statute. The significance, as you were discussing with my opposing counsel, was that at the time of these events in 2014, Regulation E did not apply to 1693L1. It now currently does, but that didn't take effect until. I'm really confused. So the. I thought there were. What do you mean by it didn't apply? So general prepaid card, general purpose prepaid cards, as well as store gift cards, were, are covered by 1693L1 and they have certain requirements in terms of disclosures, in terms of fees. They are not subject, or they were in the past, not subject to all of Regulation E's requirements. Then we can't do anything under sub I. I mean, to me, I don't understand how it could have been covered before and not covered now because the regulation changed. So there are two different claims. Sub I is giving a card without consent and without an application. So you're telling us that it wasn't covered at the time by sub I, but now it is? Is that what you mean by saying Regulation E covered? No. It was always covered by sub I. The separate, the L1 claim, which is the one that says you can't charge a fee until a year of inactivity. Right. So that doesn't have to do with it being unsolicited. The L1 claim is about the fee alone. Okay. That's the claim that regardless of whether or not this was an account within Regulation E, regardless of whether or not the Central National Bank pooled account that had her money in it falls under Regulation E, there would still be an L1 violation either way. Okay, but you seemed to say before something to the effect of this, that the nonauthorized part of it, the sub I, wasn't within the regulation previously. They have made that point. Our position is it's always been covered, and if you look at the Humphrey case, which is cited in our opening and reply brief. I thought you were just saying the opposite, so you were confusing me. I'm sorry for confusing you. It's our position that Regulation E has always applied to this product. Why doesn't it have to be Regulation E? Why isn't it just the statute? Why are we talking about Regulation E? Well, our position is the statute has always applied to this product. And the reason we got on this side trail, and I apologize that it's been confusing, is when they, in their motion to dismiss, were discussing their position that it does not apply, they spoke in terms of Regulation E. And I bring that up only to point out that there has not been a waiver here because they've been on notice of these issues regarding the significance of the statute, the significance of the definition of an account the whole time. The problem is that the two subsections of the statute go to different points, and one of them is whether it was unsolicited, which they could fix going forward by making some sort of an opt-in system. And the second one that goes to the fees, which is your bigger problem, as I understand it, in terms of the actual equities here. And with respect to making it opt-in, that was something that they actually looked at doing, and NUMMI's officers nixed it because they said that would be destructive to their business model. This is all pled in the proposed third amended complaint, based on things that came out through discovery. Ms. Gilbride? With just saying that Section I applies because you want to also invalidate the fees, which you can only do through L1. Is that right? Yes. The fees are a problem under L1. This product was marketed to the general public. We have information in the third amended complaint that goes to the marketing as well, such as the large poster that was placed in the release area, marketing the use of this product directly to the releasees. And then the last point I would just make is... Counsel, I just have to say you're already more than two minutes over your extended time. I want you to answer Judge Berzon if she still requires more. No, I thought I was done. Go ahead. All right. In that case, I urge that the opinion be reversed on any number of grounds and remanded. Thank you. Thank you, Ms. Gilbride. Well, I'm going to thank both counsel for their excellent arguments. In addition, I'll thank both counsel for traveling so far to help us out. And Ms. Gilbride from Washington. Mr. Nystrom. Mr. Nystrom, did you come from Minneapolis? I did indeed, Your Honor. Is it snowing there now? It is snowing again. But it's warmer today. It's only up to 15. Okay. Well, I hope you both have a good trip. The Brown case shall be submitted.
judges: Gould, Berzon, Benitez